997 F.2d 18
 125 Lab.Cas. P 35,834, 1 Wage & Hour Cas.2d
(BNA) 788
 Howard E. SHOCKLEY; Ray V. Ballard, Jr.; Michael L.
Brewer; Clifford T. Bowen; David E. Burgess; William T.
Cordle; David C. Dorner; Thomas L. Duggan; Henry Marvin
Evans; Joseph R. George; Milton B. Hallet; James L.
Hogan, Jr.; Joe McKinley Johnson; Carl S. Morgan, III;
Leola A. Mowry; Arthur D. Nolan; Lynn M. Pearson; Thomas
L. Penny; James E. Quail; Davis Alberts Seals, Sr.; Wayne
Wright Smith; Donald E. Spitzer; Joseph R. Storms; Ronald
K. Suttle; Jimmy Sutton; David P. Wescott; Linda Scott
Wescott; Daniel E. Wickline; Raymond E. Wilson, Sr.; Roy
Sorrell; Harry Cleveland West; Ronald T. Conley,
Plaintiffs-Appellees,
v.
CITY OF NEWPORT NEWS, Defendant-Appellant,
and
City of Newport News Police Department, Defendant.
Howard E. SHOCKLEY; Ray V. Ballard, Jr.; Michael L.
Brewer; Clifford T. Bowen; David E. Burgess; William T.
Cordle; David C. Dorner; Thomas L. Duggan; Henry Marvin
Evans; Joseph R. George; Milton B. Hallet; James L.
Hogan, Jr.; Joe McKinley Johnson; Carl S. Morgan, III;
Leola A. Mowry; Arthur D. Nolan; Lynn M. Pearson; Thomas
L. Penny; James E. Quail; Davis Alberts Seals, Sr.; Wayne
Wright Smith; Donald E. Spitzer; Joseph R. Storms; Ronald
K. Suttle; Jimmy Sutton; David P. Wescott; Linda Scott
Wescott; Daniel E. Wickline; Raymond E. Wilson, Sr.; Roy
Sorrell; Harry Cleveland West; Ronald T. Conley,
Plaintiffs-Appellants,
v.
CITY OF NEWPORT NEWS, Defendant-Appellee,
and
City of Newport News Police Department, Defendant.
 Nos. 92-1790, 92-1800.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 3, 1993.
Decided June 22, 1993.
 
 Allen Link Jackson, Deputy City Atty., City Atty.'s Office, Newport News, VA, for appellant.
 Michael Tarcissius Leibig, Zwerdling, Paul, Leibig, Kahn, Thompson & Driesen, Washington, DC (Stephen M. Smith, Joseph Smith, Ltd., Hampton, VA, on brief), for appellees.
 Before PHILLIPS, WILKINS, and WILLIAMS, Circuit Judges.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 Thirty-two current or former officers in the Newport News, Virginia, Police Department brought this action against the City of Newport News under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19 (1988 & Supp. III 1991), seeking overtime pay for the period September 1987 to the present. The City argued that the Officers were exempt from the FLSA overtime requirements because they qualified as executive or administrative employees. The Officers argued that they were not exempt for two reasons. First, they urged that they were not paid on a salary basis because City policies required reductions in pay for part-day absences, unreported absences, and attendance as a party at trial. Second, they argued that their primary duty was neither management nor administration.
 
 
 2
 The case was tried on a stipulated record. The district court found that the Officers' primary duty was either management, administration, or a combination of both.[1] The court also determined that City policies requiring reductions in pay for unreported absences and for attendance as a party at trial were consistent with payment on a salary basis. However, the court found that City policy required reductions in pay for part-day absences and that FLSA regulations prior to September 6, 1991, did not allow such reductions. Accordingly, the court ordered payment of overtime for the period September 1987 to September 6, 1991. For the period September 6, 1991, to the present, the court found that reductions in pay for part-day absences did not disqualify the Officers from FLSA exemption because the Department of Labor had promulgated a new regulation allowing such reductions. The court concluded that the Officers were not entitled to overtime pay during this period because they were exempt from FLSA regulation. Both the City and the Officers appealed.
 
 
 3
 We disagree with several of the district court's conclusions. First, the evidence does not support the court's finding that the City had a policy of reducing employees' pay for part-day absences. Second, prior to the promulgation of the September 6, 1991, regulation, the City's policy of reducing pay for unreported absences was not consistent with payment on a salary basis. Third, while we agree with many of the district court's conclusions regarding the primary duties of the individual Officers, the evidence does not support the court's conclusion that administration was the primary duty of the Media Relations Sergeants. Finally, the district court did not apply the correct test in determining whether Patrol Lieutenants and Crime Analysis Sergeants qualified for exemption based upon a combination of administrative and managerial duties.
 
 
 4
 Accordingly, we reverse the district court's finding that the Media Relations Sergeants qualified for exemption as administrative employees from the period of September 6, 1991, to the present. We remand for further fact-finding regarding whether the Patrol Lieutenants and Crime Analysis Sergeants qualify for exemption. We affirm the remainder of the district court's judgment, albeit for different reasons than those stated by the district court.
 
 
 5
 * Introduction
 
 
 6
 Section 7(a)(1) of the FLSA, 29 U.S.C. § 207(a)(1), requires that employees be paid time and a half for work over forty hours a week. Section 13(a)(1) of the FLSA, 29 U.S.C. § 213(a)(1), however, provides an exemption from the overtime pay requirement for persons "employed in a bona fide executive, administrative, or professional capacity." Employers must prove by clear and convincing evidence that an employee qualifies for exemption. Clark v. J.M. Benson Co., 789 F.2d 282, 286 (4th Cir.1986).
 
 
 7
 Department of Labor regulations define what constitutes employment in an executive or administrative capacity. Two requirements are pertinent here. First, to qualify for the exemption, an employee must be paid "on a salary basis." 29 C.F.R. §§ 541.1(f), 541.2(e) (1992).[2] Second, an employee's primary duty must be either management, administration, or a combination of the two. Id. §§ 541.1(f), 541.2(e), 541.600(a) (1992). The Officers contend that neither of these requirements was satisfied.
 
 II
 Salary Test
 
 8
 The Officers contend that they were not paid "on a salary basis" because City policy required that their pay be reduced based on the quality or quantity of work performed. Their argument derives from 29 C.F.R. § 541.118(a) (1992), which provides that:
 
 
 9
 An employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked. This policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work.
 
 
 10
 (Emphasis added.); see id. § 541.212 (cross-referencing § 541.118 with regard to administrative employees). The Officers urge that City policy requires reductions in pay for part-day absences, for attendance as a party at trial, and for unreported absences, and that these reductions are not permitted under the regulations. We address each of these arguments in turn.
 
 A. Part-Day Absences
 
 11
 The Officers contend that City policy required reductions in their salaries for part-day absences. Although the regulations allow employers to reduce a salaried employee's pay "when the employee absents himself from work for a day or more for personal reasons, other than sickness or accident," 29 C.F.R. § 541.118(a)(2), they do not allow reductions for part-day absences. Such reductions defeat any claim that the employee was paid on a salary basis. Abshire v. County of Kern, 908 F.2d 483, 487 (9th Cir.1990), cert. denied, 498 U.S. 1068, 111 S.Ct. 785, 112 L.Ed.2d 848 (1991); Hawks v. City of Newport News, 707 F.Supp. 212, 214-15 (E.D.Va.1988).
 
 
 12
 The Department of Labor created an exception to this principle on September 6, 1991, when it promulgated 29 C.F.R. § 541.5d (1992), amended, 57 Fed.Reg. 37,666, 37,677 (Aug. 19, 1992). Under § 541.5d, public employees are not disqualified from exemption merely because a pay system established by statute, ordinance, regulation, or public policy requires that the employee's pay be reduced for part-day absences. Id. Therefore, to the extent that City policy in fact required such reductions, the policy only affects whether the Officers were paid on a salary basis prior to September 6, 1991.[3]
 
 
 13
 The district court agreed with the Officers that under City policy their pay could be reduced for part-day absences. The primary evidence supporting this conclusion was a set of letters sent by Jay A. Carey, Jr., the Chief of Police, to each of the Officers. The letters were the same in substance. For example, Carey wrote to Sergeant D.P. Wescott that "[a]s a plaintiff in this case you must take annual, personal leave, or leave without pay for any period of time you are not at your work assignment as a result of the court case." (J.A. at 152.) Carey attached to each letter a copy of § 705 of the City Personnel-Administrative Manual. Section 705 provided that vacation or personal leave must be used when an employee appears as a party in a case but is not represented by the City Attorney. Section 705 implemented § 2-98(c) of the City Code, which provided that "[e]mployees appearing as a party in a case shall not be entitled to civil leave with pay during such court appearances." (J.A. 149.) In addition, § 608 of the Manual specified that leave was "computed in 15 minute increments with the exception that employees who are exempt from overtime and who have exhausted all accumulated leave balances will not have pay docked for any approved absence of less than one day." (J.A. at 394.)
 
 
 14
 The evidence before the district court also included an affidavit submitted by the City in which Chief Carey stated that his letter only paraphrased § 705 of the Personnel-Administrative Manual and was not intended as an independent statement of city policy. The City also produced a letter from its Director of Personnel, Caroline Hurt, dated December 7, 1988, which stated that:
 
 
 15
 Retroactive to April 15, 1986, employees in positions which have been declared exempt from overtime and who have exhausted all vacation and sick leave accumulations shall not have their pay docked for part-day absences.... If any exempt employee has had pay docked for approved leave of less than one day since April 15, 1986, the employee will be compensated for the time docked.
 
 
 16
 (J.A. at 412.) Ms. Hurt testified at her deposition that the City had never had a policy of docking exempt employees for part-day absences, but that the letter was sent out nevertheless as clarification. Chief Carey indicated in response to Hurt's letter that "[w]e do not have any employees who will be affected by this change." (J.A. 413.)
 
 
 17
 The district court found that the Officers' "leave for attendance as a party in a lawsuit is not 'approved' leave for which an employee will be paid." (J.A. at 521.) Reading § 2-98 of the City Code together with § 705 of the Manual and the Chief of Police's letter, the court concluded that under City policy the Officers "were not to be paid for their part day absences while appearing as plaintiffs in this case." (J.A. at 520.) The district court further concluded that the City had a policy of reducing the Officers' pay for part-day absences and accordingly found that the Officers were not salaried employees prior to September 6, 1991.
 
 
 18
 The district court clearly erred in finding that the City had a policy of docking employees' pay for part-day absences. We have no quarrel with the court's conclusion that the Officers' pay was subject to reduction for time devoted to appearances as a party in a court case, this case in particular. However, in concluding that this policy applied to part-day absences, the district court relied primarily upon the letters sent by the Chief of Police. These letters do not bear the weight that the court placed upon them. Chief Carey's affidavit indicates that he merely intended to paraphrase § 705, a statement that was fully consistent with the letters themselves. The letters cross-referenced § 705, which makes no reference to part-day absences. In rejecting the affidavit, the district court relied upon the principle that "a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." Mack v. United States, 814 F.2d 120, 124 (2d Cir.1987); see also Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984). This reliance was misplaced. The principle set forth in Mack serves to prevent parties from using affidavits to create "sham issues of fact," thereby destroying the utility of the summary judgment procedure. Barwick, 736 F.2d at 960.
 
 
 19
 We are not concerned here with a "sham issue of fact" used to prevent summary judgment; to the contrary, the meaning of Chief Carey's letter was a genuine factual issue that required resolution at trial. Moreover, Chief Carey's letter was not the equivalent of deposition testimony. In writing the letter, Chief Carey did not testify under oath, nor was he subject to cross-examination. In these circumstances, the district court should not have disregarded Chief Carey's affidavit on the sole basis that it contradicted his earlier letter.
 
 
 20
 Without the support of Chief Carey's letter, the evidence does not support the district court's conclusion that City policy required reductions in pay due to part-day absences. Section 2-98 of the City Code and § 705 of the City Personnel-Administrative Manual did not address part-day absences. Apart from Chief Carey's letter, all of the other evidence, including § 608 of the Manual, indicated that part-day absences would not cause reductions in pay. Accordingly, we conclude that the district court clearly erred in finding that the City had such a policy, and therefore erred in finding on that basis that the Officers were disqualified from FLSA exemption.[4]
 
 B. Attendance as a Party at Trial
 
 21
 The Officers also contend that they were not paid on a salary basis because City policy required reductions in salary for attendance as a party at trial. The City acknowledges that it had such a policy, but contends that the policy was consistent with FLSA regulations. The regulations provide that "[d]eductions may not be made for absences of an employee caused by jury duty, attendance as a witness, or temporary military leave." 29 C.F.R. § 541.118(a)(4). Jury duty, attendance as a witness, and military leave all involve performance of a civic duty. Attendance as a party does not. We agree with the district court that reductions in pay for attendance as a party do not run afoul of § 541.118(a)(4).
 
 C. Disciplinary Suspensions
 
 22
 The Officers also urge that they were not salaried employees because under City policy they could be suspended without pay for failing to report absences. The evidence indicated that City policy allowed suspensions without pay for repeated failures to call-in absences from work.
 
 
 23
 Under the regulations, a salaried employee's pay may not be "subject to reduction because of variations in the quantity and quality of the work performed." 29 C.F.R. § 541.118(a). The initial question presented is whether reductions imposed for disciplinary reasons relate to "the quantity and quality of work." The regulations address this question only indirectly. Specifically, § 541.118(a)(5) provides that:
 
 
 24
 Penalties imposed in good faith for infractions of safety rules of major significance will not affect the employee's salaried status. Safety rules of major significance include only those relating to the prevention of serious danger to the plant, or other employees, such as rules prohibiting smoking in explosive plants, oil refineries, and coal mines.
 
 
 25
 Courts construe exemptions to the FLSA narrowly "in order to further Congress' goal of providing broad federal employment protection." Abshire, 908 F.2d at 485. Guided by this principle, courts have concluded that because an exception was necessary for safety rules of major significance, reductions made for infractions of other types of rules constitute reductions based on the quantity and quality of an employee's work. E.g., Klein v. Rush-Presbyterian-St. Lukes Medical Ctr., 990 F.2d 279, 285 (7th Cir.1993); Lacey v. Indiana State Police Dep't, 810 F.Supp. 244, 247 (S.D.Ind.1992). Klein, for example, involved a nurse in an acute care unit for patients with severe psychological disorders. Id. at 281. The Seventh Circuit concluded that because the nurse's pay was subject to reduction for tardiness as well as for rude, abrupt, and irritable behavior to fellow staff members, she was not paid on a salary basis. Id. at 286. Service Employees International Union, Local 102 v. County of San Diego, 784 F.Supp. 1503 (S.D.Cal.1992), involved facts strikingly similar to those in this case. The plaintiffs, deputy probation officers, were subject to discipline if they left work "for even a few hours without seeking and obtaining permission." Id. at 1508. The court concluded that the employees were not paid on a salary basis. Id. at 1511; see also Lacey, 810 F.Supp. at 248 (disciplinary reductions for insubordination, discourtesy or insolence, abuse of sick leave, tardiness, and uncleanliness, among other grounds); Pautlitz v. City of Naperville, 781 F.Supp. 1368, 1372 (N.D.Ill.1992) (disciplinary reductions for accepting gratuities). We agree with these holdings and conclude that disciplinary reductions in pay, other than for violations of major safety rules, constitute reductions in pay based on the quantity and quality of an employee's work.
 
 
 26
 We also conclude, contrary to the City's suggestion otherwise, that a failure to report absences from work simply does not violate a "safety rule of major significance" as contemplated by § 541.118(a)(5). To hold otherwise would require stretching the meaning of "safety rule" in a manner antithetical to the goal of broad federal employment protection. Cf. Pautlitz, 781 F.Supp. at 1372 n. 6 (rejecting the idea that "disciplinary infractions by law enforcement personnel could be construed as safety violations inasmuch as any breakdown in discipline may be seen ultimately to jeopardize public health and safety"). Because reductions in pay for failure to report absences are reductions based on quantity and quality of work and do not fall within one of the exceptions to § 541.118, we conclude that the Officers were not paid on a salary basis from September 1987 to September 6, 1991.
 
 
 27
 With regard to the period from September 6, 1991, to the present, we conclude differently. The power to reduce an employee's pay for failure to report an absence is inherent in the power to reduce an employee's pay for part-day and full-day absences for personal reasons, both of which were permissible following promulgation of § 541.5d. The Department of Labor made this point clear when it amended § 541.5d on August 19, 1992. Under the amended regulation, employees of public agencies are not disqualified from exemption as managers or administrators if agency policy requires the "employee to be placed on leave without pay for absences for personal reasons ... when accrued leave is not used by an employee because ... permission for its use has not been sought." 57 Fed.Reg. at 37,677. The regulation expressly authorizes suspensions without pay as a disciplinary sanction for public employees who are absent without leave. The City's disciplinary policy therefore did not disqualify the Officers from exemption after September 6, 1991.
 
 D. Summary
 
 28
 Although the district court erred both in its factual findings regarding pay reductions for part-day absences and in its conclusion that FLSA regulations permitted disciplinary suspensions of public employees for failing to report absences, its ultimate conclusion was correct. From September 1987 to September 6, 1991, the Officers were not paid "on a salary basis" because they were subject to disciplinary suspensions without pay. From September 6, 1991 to the present, the Officers were paid on a salary basis due to the change in FLSA regulations.
 
 III
 The Officers' Duties
 
 29
 In addition to proving that the Officers were salaried employees, the City also had to prove that each Officer's primary duty was either management, administration, or a combination of both in order to claim successfully the exemption for employment in, respectively, an executive capacity, an administrative capacity, or in a combination of both capacities. We shall address each exemption separately.
 
 A. The Executive Exemption
 
 30
 The regulations provide both a "short test" and a "long test" for determining whether an employee's primary duty is management. 29 C.F.R. § 541.1; see Murray v. Stuckey's, Inc., 939 F.2d 614, 617 (8th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992). The short test applies where the employee is paid more than $250 a week. 29 C.F.R. §§ 541.1(f). The parties agree that the Officers' pay exceeded this threshold, and hence that the short test applies here.
 
 
 31
 An employee satisfies the short test for executive employment if the employee's "primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein." Id. § 541.1(f) (emphasis added). Analysis of whether an employee's primary duty is management begins with determining which of the employee's duties involve management of a recognized department or subdivision of the employer. As a "rule of thumb," the employee must devote more than fifty percent of his time to these duties. 29 C.F.R. § 541.103 (1992). Other pertinent factors, however, may indicate that management is the employee's primary duty. Among the factors to be considered are: (1) the relative importance of the managerial duties as compared with other types of duties, (2) the frequency with which the employee exercises discretionary powers, (3) the employee's relative freedom from supervision, and (4) the relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. Id.
 
 
 32
 Whether a particular duty is administrative or managerial presents a legal question "governed by the pertinent regulations promulgated by the Wage and Hour Administrator." Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986). In contrast, the amount of time devoted to managerial duties, and the significance of those duties, present factual questions that we review for clear error. Fed.R.Civ.P. 52(a); see Icicle Seafoods, Inc., 475 U.S. at 714, 106 S.Ct. at 1530; Clark, 789 F.2d at 286 n. 2 (deviation from 50% "rule of thumb ... requires consideration of the factual circumstances for which a jury is more appropriate").
 
 
 33
 The district court found that the Patrol Sergeants, the Storefront Operation Sergeant, the Support Unit Sergeant, the Criminal Investigations Squads Sergeants, and the Narcotics Unit Teams Sergeant (collectively, "the Sergeants") all qualified as executive employees. We conclude that the evidence was sufficient to support these findings.
 
 
 34
 The Officers concede that each of the Sergeants supervised at least two subordinates. They note, however, that employees must do more than just supervise subordinates in order to qualify as executives. See International Ass'n of Fire Fighters, Alexandria Local 2141 v. City of Alexandria, 720 F.Supp. 1230, 1233 (E.D.Va.1989), aff'd, 912 F.2d 463 (4th Cir.1990). They must also manage a recognized subdivision of the police department. The Sergeants contend that their superiors managed their respective units, and that they were better classified as "working foremen." In so doing, they invoke 29 C.F.R. § 541.115 (1992), which provides:
 
 
 35
 (a) The primary purpose of the exclusionary language placing a limitation on the amount of nonexempt work is to distinguish between the bona fide executive and the "working" foreman or "working" supervisor who regularly performs "production" work or other work which is unrelated or only remotely related to his supervisory activities....
 
 
 36
 (b) One type of working foreman or working supervisor most commonly found in industry works alongside his subordinates. Such employees ... perform the same kind of work as that performed by their subordinates, and also carry on supervisory functions.
 
 
 37
 The "working foreman" concept is useful because it helps to distinguish between a manager of a recognized subdivision and a mere supervisor of subordinate employees.
 
 
 38
 The district court considered several factors persuasive in finding that the Sergeants' primary duty was management. The Sergeants were responsible for evaluating the performance of the officers they supervised. Although the evaluations were carefully scrutinized by the supervising lieutenant, the Sergeants uniformly agreed that their recommendations were almost always followed. The Sergeants also had a higher salary range than their subordinates, although their actual salary might be lower depending upon the number of years of service. For example, in 1990, a police officer's base salary ranged between $19,295 and $29,675; a master police officer's salary ranged between $31,715 and $37,735; and a sergeant's salary ranged between $28,560 and $46,115. In addition, the particular responsibilities of the individual sergeants demonstrate that management was their primary duty.
 
 
 39
 Patrol Sergeants' responsibilities included making adjustments for sick personnel and determining which district their officers would patrol. They determined which equipment was available and issued it as necessary, including automobiles, portable radios, radar units, and special weapons. They briefed the patrol officers regarding any special orders or about any investigations. While on the streets, the Patrol Sergeants monitored the radio and backed up patrol officers when required. They had and exercised the authority to overrule a dispatcher and change assignments.
 
 
 40
 The Storefront Operation Sergeant had responsibilities similar to those of the Patrol Sergeants. The Storefront Operation Unit operated on foot instead of in cars and patrolled a high-crime area of Newport News. The Unit's sergeant decided on which of the two shifts his men would work and adjusted duty assignments to accommodate absences and problems arising in the community. Although serious problems encountered on patrol were referred to his superiors, the sergeant handled most problems encountered by his officers himself. He rarely went on patrol, and when he did his primary purpose was to observe his officers for purposes of evaluation. In short, the primary responsibility of the Storefront Operations Sergeant was the allocation and management of police resources to insure police services were being provided in the patrolled neighborhoods.
 
 
 41
 The Support Unit Sergeant dealt mainly with traffic in handling special events, funeral escorts, parades, and foot races. He spent about half his time in the office and half on assignment. During the time in the office, his duties included preparing evaluations of his officers, handling personnel problems, and addressing complaints about officers. He also spent about sixty percent of his time in the office working on traffic analysis. When on assignment, his role was to supervise the other officers in the Support Unit.
 
 
 42
 The Criminal Investigations Division included five squads of detectives, each squad headed by a sergeant: the Homicide/Sexual Assault Squad, the Robbery Squad, the Burglary Squad, the General Assignments Squad, and the Warrant Control Squad. The sergeants heading each squad played two roles: supervising their subordinate officers and investigating crimes. Much of their time was spent in the office reading reports and digesting the various information collected by officers in the field. Their goal was to insure that their officers completed their investigations and tied-up all loose ends. They determined which cases could likely be solved and which should be filed without further investigation. Their responsibilities also included officer discipline, making sure that officers completed their training, and insuring that the officers had the equipment they needed and that the equipment was in good working order. In short, the role of the sergeants in the Criminal Investigations Division was to manage the available resources, personnel and otherwise, to insure that the crimes most needing investigation were in fact investigated and, with good fortune, solved.
 
 
 43
 The Narcotics Unit Teams Sergeants' responsibilities included planning drug raids and overseeing their execution in the field. Much of their time was spent in the field. Their responsibilities also included the management of informants and the disbursement of confidential funds. The district court recognized that these sergeants spent a majority of their time in the field engaged in law enforcement activities, but concluded that the primary purpose of the sergeants' field activities "was to make any on the spot decisions that were required, ensure that proper safety precautions were taken, and to supervise, correct, train, and evaluate their officers." (J.A. 573.)
 
 
 44
 Although in many respects each of the Sergeants discussed above resembles a "working foreman," the district court had ample reason to conclude that they had more responsibility over their units than the working foreman concept contemplates. Their responsibilities extended not only to direct supervision of their subordinates, but also to the evaluation of the subordinates and to the management of both the people and equipment assigned to their units. These responsibilities required the exercise of considerable discretion, discretion that typically is not given to a working foreman. From our review of the record, we conclude that the evidence supported the district court's finding that the Sergeants' primary duty was management, and hence that they qualified as executives under FLSA regulations.
 
 B. The Administrative Exemption
 
 45
 The district court concluded that the Ethics and Standards Lieutenant and the Media Relations Sergeants qualified for the administrative exemption. We agree with the district court's conclusion with regard to the Ethics and Standards Lieutenant, but disagree with regard to the Media Relations Sergeant.
 
 
 46
 As with the executive exemption, the regulations provide both short and long tests for determining whether administration is the primary duty of an employee. 29 C.F.R. § 541.2. The short test applies here because the Officers are paid more than $250. See 29 C.F.R. § 541.2(e)(2). An employee satisfies the short test for administrative employment if the employee's "primary duty consists of the performance of [office or nonmanual work directly related to management policies or general business operations of his employer], which includes work requiring the exercise of discretion and independent judgment." Id. § 541.2(e)(2) (emphasis added) (incorporating language from § 541.2(a)(1)). The same principles discussed above with regard to determining whether an employee's primary duty is management apply as well in analyzing whether an employee's primary duty is administration, albeit focused on administrative as opposed to managerial duties. 29 C.F.R. § 541.206(b) (1992). Thus, the short test for determining whether an employee is employed in an administrative capacity requires proof either that the employee spends half his time on administrative duties or that administrative duties have special significance relative to the employee's other duties.
 
 
 47
 The Ethics and Standards Lieutenant satisfied the short test for administrative employment. This officer devoted her time to the investigation of complaints against other officers. After taking statements from witnesses, she analyzed the relevant facts, interpreted department policy, and made one of four recommendations: sustained, not sustained, unfounded, or exonerated. Her recommendations were then forwarded to her captain and eventually to the Chief of Police. The recommendations were followed about ninety percent of the time.
 
 
 48
 The regulations indicate that these duties are administrative. Pertinent here is 29 C.F.R. § 541.205(c)(3) (1992), which provides as follows:
 
 
 49
 Some firms employ persons whom they describe as "statisticians." If all such a person does, in effect, is to tabulate data, he is clearly not exempt. However, if such an employee makes analyses of data and draws conclusions which are important to the determination of, or which, in fact, determine financial, merchandising, or other policy, clearly he is doing work directly related to management policies or general business operations. Similarly, a personnel employee may be a clerk at a hiring window of a plant, or he may be a man who determines or effects personnel policies affecting all the workers in the establishment. In the latter case, he is clearly doing work directly related to management policies or general business operations.
 
 
 50
 (Emphasis added.) The Ethics and Standards Lieutenant spent all her time accumulating and analyzing data and making recommendations that shaped the police department's policy with regard to internal discipline. She therefore spent more than half her time on work "directly related to management policies," 29 C.F.R. § 541.2(a)(1), work that required discretion and the exercise of independent judgment. The district court did not err in concluding that her primary duty was administration.
 
 
 51
 The Media Relations Sergeants, however, do not satisfy the short test for administrative employment. These officers spent half their time on the "crime line," answering the phone, taking tips, and passing them on to the right department. The remainder of their time was spent on various responsibilities including screening calls to the Chief of Police, responding to impromptu questions by the press, determining what information should be released to the press regarding ongoing investigations, and developing an ongoing news broadcast called "Crime of the Week."Under the regulations, these are not administrative duties. The sergeants' work on the "crime line" was production work, not work related to the administrative operations of the police department. See 29 C.F.R. § 541.205(a); Bratt v. County of Los Angeles, 912 F.2d 1066, 1070 (9th Cir.1990) (activities must be directly related to "the running of a business and not merely the day-to-day carrying out of its affairs"), cert. denied, 498 U.S. 1086, 111 S.Ct. 962, 112 L.Ed.2d 1049 (1991). The work with the media generally lacked the discretion necessary under the regulations. In screening the Chief of Police's calls, only pre-approved questions were asked, and only pre-approved answers were given. The information the sergeants released to the public was determined according to state law and highly detailed guidelines. The Sergeants had discretion in the preparation of the "Crime of the Week" broadcast, but nothing in the record indicates that preparing the broadcast was significant relative to their other duties. We find no basis in the record for concluding that the Media Relations Sergeants' primary duty consisted of work involving discretion and "directly related to management policies or general business operations" of the police department. 29 C.F.R. § 541.2(a)(1) & (e)(2). Accordingly, we reverse the district court's finding that the Media Relations Sergeants were exempt from FLSA overtime requirements.
 
 C. Combination Exemptions
 
 52
 The district court concluded that the Patrol Lieutenants and Crime Analysis Sergeants qualified for exemption based on a combination of executive and administrative duties. The court, however, made no factual findings regarding how much time these officers spent on non-exempt work. Instead, the court combined the officers' administrative and managerial duties and applied a combination short test.
 
 
 53
 The regulations "permit[ ] the 'tacking' of exempt work under one section of the regulations ... to exempt work under another section of those regulations." 29 C.F.R. § 541.600(a). Employees whose primary duty is neither management nor administration may qualify for a combination exemption based upon both their administrative and management responsibilities. "In combination exemptions, however, the employee must meet the stricter of the requirements on salary and non-exempt work." Id. This limitation indicates that employees cannot qualify for an exemption under a combination of the short tests for executives and administrators. Rather, an employee only qualifies for a combination exemption if the employee satisfies a combination of the long tests, including the stricter salary and non-exempt work requirements.
 
 
 54
 Because the district court neither made the factual findings necessary for application of a combination exemption under the long tests, nor made the factual findings necessary for application of the short test for executives or the short test for administrators, we remand for further consideration of whether Patrol Lieutenants and Crime Analysis Sergeants qualify for exemption.
 
 IV
 Conclusion
 
 55
 For the foregoing reasons, we affirm the district court's finding that the officers were not exempt from FLSA regulation and therefore were entitled to overtime pay prior to September 6, 1991. With the exception of the Media Relations Sergeants, the Patrol Lieutenants, and the Crime Analysis Sergeants, we affirm the court's finding that the Officers were exempt from regulation for the period following September 6, 1991. We remand for calculation of damages with regard to the Media Relations Sergeants and for further factual findings with regard to the Patrol Lieutenants and the Crime Analysis Sergeants.
 
 
 56
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 The district court found that management was the primary duty of the Patrol Sergeants, Storefront Operation Sergeant, Support Unit Sergeant, Criminal Investigations Squads Sergeants, and Narcotics Unit Teams Sergeant. The court found that administration was the primary duty of the Ethics and Standards Lieutenant and the Media Relations Sergeants. Finally, the court found that a combination of administration and management was the primary duty of the Patrol Lieutenants and the Crime Analysis Sergeants
 
 
 [2]
 Although not pertinent here, employees paid on a fee basis may in some circumstances qualify for the administrative exemption. 29 C.F.R. § 541.2(e)(1)
 
 
 [3]
 The City has not challenged the district court's determination that § 541.5d does not apply retroactively, and we accordingly do not address that point
 
 
 [4]
 The City makes three other arguments. First, the City contends that the district court erred in denying it partial summary judgment on the salary test. Second, the City contends that the original pre-trial order did not specify that the Officers challenged their classification as salaried employees based upon part-day reductions in pay, and that the district court erred in allowing the Officers to raise the issue by amending the pre-trial order. Third, the City contends that any award of overtime pay should be limited to the pay period in which Chief Carey wrote his letter. All three arguments either attack or attempt to limit the district court's finding that City policy required reductions in pay for part-day absences. Because we conclude that this finding was clearly erroneous, we need not address these alternative arguments